**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re Proposed sale of Debtor's stock in MADISON SQUARE GARDEN CORP., and proposed settlement agreement in respect to Pennsylvania Tunnel and Terminal Railroad Company trust agreement.**

**No. 70-347.**

United States District Court, E. D. Pennsylvania.

Sept. 16, 1971.

Marvin Comisky, Blank, Rome, Klaus & Comisky, Special Counsel for Trustees, Penn Central Transportation Co., John F. Bomster, Edwin K. Taylor, John E. Wallace, Jr., and Blank, Rome, Klaus & Comisky, by Daniel J. McCauley, Philadelphia, Pa., for trustees, Penn Central Transportation Co.

David Berger and Herbert B. Newberg, Philadelphia, Pa., for Richard Robinson, on behalf of all shareholders of Penn Central Co.

Davis, Polk & Wardwell, by Stephen H. Case, New York City, for Morgan Guaranty Trust Co. of New York, as trustee.

Debevoise, Plimpton, Lyons & Gates, by Robert J. Geniesse and Michael E. Patterson, New York City, for Provident Nat. Bank and A. Wakelee Swartz, Loan Trustees.

Dechert, Price & Rhoads, by Matthew Broderick and Norma Shapiro, Philadelphia, Pa., for Penn Central Co.

Drinker, Biddle & Reath, by Jack B. Justice, Philadelphia, Pa., for Chase Manhattan Bank.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.

Morgan, Lewis & Bockius, by John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank.

Ballard, Spahr, Andrews & Ingersoll, by Morris Cheston, Jr., Philadelphia, Pa., for Girard Trust Bank and Morgan Guaranty Trust Co.

Bader & Bader, by I. Walton Bader, New York City, for Penn Central Bondholders Protective Committee.

Tate, Diamond, Polsky, Bauer & Ervin, by W. Bourne Ruthrauff and Mercer D. Tate, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford R.R.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The Debtor owns 1,045,593 shares of the common stock of Madison Square Garden Corp. (MSG).[1] Of this, 902,-690 shares are pledged as security for the Debtor's obligations under a Guaranty and Subordination Agreement dated December 1, 1964, pursuant to which the Debtor guaranteed the payment of principal and interest on certain notes, aggregating $50,000,000, of the Pennsylvania Tunnel and Terminal Railroad Company (PT&T), a wholly-owned subsidiary of the Debtor. All of the assets of PT&T were leased to the Debtor for a term of 999 years commencing June 14, 1928.

As further security for its guaranty obligations, the Debtor assigned the rentals accruing to it under certain leases (the Station leases), amounting to about $1,850,000 per year. The pledge documents provide that, in the absence of default, these rentals are payable to the Debtor. The filing of Debtor's reor-

ganization petition constituted an event of default, and certain further defaults have occurred since the petition was filed. However, Order No. 1 in these proceedings has prevented the Loan Trustees from attempting to sell the collateral; and, pursuant to Order No. 15, the lease rentals are being held in escrow.[2]

The Loan Trustees have apparently indicated to the Trustees an intention to assert that the pledge agreement and other loan documents amounted to a perfected pre-bankruptcy assignment of both the MSG stock and the lease rentals; the Trustees take a contrary position. In an attempt to avoid protracted litigation of these issues, the parties now propose to effect an interim compromise, under which the pledged stock would be sold, and the proceeds, together with the escrowed rents, would be divided equally between them; and the lease rentals for the next 4½ years (or until approval of a Plan of Reorganization of the Debtor, whichever date is earlier) would be paid directly to the Loan Trustees. Left open for later determination would be (a) how the payments to the Loan Trustees should be credited, as between principal, interest, and other possible charges; and (b) the proper disposition of rentals accruing after the 4½ year period.

The Trustees have therefore petitioned this Court for approval of the proposed compromise settlement, and for approval of a proposed sale of all of the Debtor's MSG stock at $3.50 per share ($3.44 net of commissions).

On the present record, it would not be feasible to approve the proposed settlement unless the proposed sale of stock is also approved. As a practical matter, the various facets of this proposed transaction are not now severable. Accordingly, the first issue to be decided is whether or not the terms of the pro-

---

1. There are a total of 23,810,861 shares of MSG common stock outstanding; the Debtor's interest represents approximately 4.4%. However, the Debtor's wholly-owned subsidiary, the Pennsylvania Com-

pany (Pennco) owns an additional 1,462,-000 shares.

2. The balance in this escrow account, as of July 14, 1971, was $2,646,377.91.

posed sale are fair and reasonable, and in the best interests of the Debtor's estate. The sale is opposed by various bondholders and other holders of equity interests.

The stock is unregistered, or "letter" stock. The Trustees' financial adviser, Mr. John Guest, of Kuhn Loeb & Co., testified that this fact, under the circumstances, would justify a discount of approximately 20% or 25%; the proposed price, $3.50 per share, is about 12.5% below the market as of the date of the final hearing (but about 25% below the recent average price of the stock).

On the other hand, it is now clear that the proposed purchaser is an "insider" in a position of control, and it would therefore appear that the unregistered character of the stock would be of no great significance to this purchaser.[3] (Any stock acquired by such a purchaser would have to be treated as unregistered in any event.) However, the restrictions on the stock do have the effect of greatly limiting the number of possible purchasers.

If the stock were to be "freed up," either by registration or the issuance of a "no action" letter by the SEC, other imponderables would emerge. The possibility of sales to the public might encourage insiders to make a higher offer; but the availability of such a large block of stock might well have an adverse effect upon the market price.

On balance, I am persuaded that the best interests of the Debtor's estate would be served by registering the stock, or otherwise freeing it from restrictions. Under the provisions of the agreement pursuant to which the shares were issued (Exhibit T–5, paragraph 13), it would seem that registration could be accomplished without undue expense or difficulty.[4]

It is to be noted that all of the stock would not necessarily be rendered immediately available for sale; the status of the pledged stock would still have to be determined, by settlement agreement or otherwise. Moreover, the Trustees would presumably be able to give recognition to market consequences, in deciding the appropriate time or times to dispose of the stock, if sales to the public were to be made. Of course, I do not rule out further negotiations for private placement, either before or after the restrictions are lifted.

I recognize, and fully accept, the view of the Trustees' financial adviser that rejection of the present offer involves some risk. However, in view of the present market price, the substantial improvements in earnings which MSG has experienced, and the excellent prospects for continued improvement, such risks do not seem formidable. In any event, it is clear that the parties having the most direct interest in the matter are eager to assume whatever risks may be involved.

A further consideration should be mentioned. The proposed sale would net the estate $3.44 per share, after broker's commissions of $.06 per share. In view of the magnitude of the transaction, under prevailing practices among members of the stock exchange, a negotiated commission would be appropriate. The uncontradicted evidence at the hearings was to the effect that the proposed commissions are excessive.

For the foregoing reasons, I have concluded that the proposed sale should not be approved. The remaining issues raised by the petition need not be discussed.

3. The offer to purchase was made by Bear, Stearns & Co., as broker. At the final hearing, it was stated that the actual purchasers are Gulf & Western Corporation (945,593 shares) and the chief executive officer of MSG (100,000 shares).

4. It was suggested at the hearings that this Court could, by virtue of § 77(a) of the Bankruptcy Act, and § 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), eliminate the restrictions on the sale of the stock. I deem it unnecessary at present to decide this issue, and undesirable to do so without notice to the SEC.